## WILLIAMS v. McKINLEY et al.

### (Circuit Court, D. Minnesota, Fifth Division. December 27, 1894.)

AGENCY—FRAUD ON PRINCIPAL.

Complainant was the owner of a quantity of land on which iron ore had been discovered. At the request and upon the representation of defendant that it would facilitate negotiations by him with certain capitalists for a lease of the mines to them, complainant executed to defendant a lease of certain lands, providing for certain royalties on all ore mined, in lieu of rent, and a contract was executed at the same time by both parties, by which defendant agreed, among other things, in consideration of the receipt by him of one-fifth of the net revenues derived by complainant from royalties, faithfully to manage said property, under complainant's direction, for their mutual interests. The contract also provided that if defendant, without complainant's consent, used or transferred the lease, otherwise than to the capitalists with whom he was negotiating, he should thereby forfeit his one-fifth interest. Defendant's negotiations failed, and complainant then, at his request, consented to his leasing a part of the land to M. Instead of a part, defendant leased to M. the whole of the land, and immediately took back a lease to himself of the part as to which no permission to lease had been given by complainant. He then proceeded to lease parts of this land to sundry persons for mining purposes, receiving from them large sums in money and stocks, of all which complainant had no knowledge until long afterwards. Complainant subsequently confirmed in writing two of the leases made by defendant, but this was done with only a partial knowledge of defendant's transactions. *Held*, that defendant was complainant's agent, and not his lessee, and was accountable to complainant for all profits made by him out of his dealings with the property; and having violated the contract, and acted contrary to the interest of his principal, and for his own gain, he forfeited his one-fifth interest, and was not entitled to compensation for his services.

Bill by John M. Williams against John McKinley and George A. Elder for an accounting. The cause was heard on the pleadings and proofs.

Herrick, Allen & Boyesen and J. L. Washburn, for complainant.
Walter Ayers, for defendant John McKinley.
Cash, Williams & Chester, for defendant George A. Elder.

NELSON, District Judge. John Williams, a resident and citizen of the state of Illinois, brings this suit in equity against the defendants, John McKinley and George A. Elder. The bill alleges, in general terms, that complainant, the owner of a large quantity of land in the state of Minnesota, upon a part of which iron ore had been discovered, at the request of defendant McKinley, executed to him a lease of 13 tracts, of about 40 acres each, and an agreement, of even date therewith, whereby McKinley was to act as his agent in leasing these 13 tracts to a certain syndicate in the east, for mining purposes, and was to receive for his services in so doing, and for managing the property, a one-fifth part of the net revenue arising therefrom; that McKinley, being unable to interest said syndicate,

stated to Williams that he could lease three definite tracts of said lands to Leonidas and Alfred Merritt, and obtained his authority so to do; that thereupon, without the knowledge or consent of complainant, he leased to them, not only the three, but the whole thirteen, tracts, and on the same day took back from them a lease to himself of all said lands save the three tracts; that thereafter McKinley leased the remaining tracts to other parties for mining purposes, without the knowledge or consent of his principal; that, for making these leases, he received large amounts of money and stock, whereby great profit inured to himself, instead of to complainant; and this bill is filed for an accounting of all moneys or property received by McKinley as the proceeds of such leases, and praying that the agreement or contract of agency between the parties be canceled, and that the defendant McKinley be decreed to have no interest therein. The bill further sets forth that the defendant George A. Elder claims to have some interest in the agreement made between complainant and McKinley, and in some of the moneys or profits made by the latter in the above transactions, and asks that George A. Elder be decreed to have no interest therein or right or title thereto. The defendants answer separately. McKinley denies that he was the general agent of complainant as to these lands in question; admits the leasing to the Merritts of the thirteen tracts, and the re-leasing to him by them of all but the three tracts; admits that he received certain profits for making the leases to the Merritts; admits that he leased the remaining tracts to certain other parties, and that he received large quantities of stock for so doing; admits that he sold and transferred a part of his interest in said remaining tracts to other parties, and received certain profits therefor; but alleges that each and all of these transactions were rightful and lawful, and with the knowledge and consent of complainant, or that the latter afterwards ratified all that he (McKinley) had done in the premises. The defendant Elder sets up in his answer that, by virtue of an instrument in writing from McKinley to him, he has an interest in the agreement or contract made between complainant and McKinley hereinbefore referred to. A replication was filed, and a large amount of testimony, both oral and documentary, was taken before a master, the record whereof was filed in court; and after hearing the arguments of counsel, and carefully considering the evidence in the case, I find the following facts:

Complainant, at the times mentioned, was the owner of all the lands set out in the bill of complaint, and he and defendants were residents and citizens of the states of Illinois and Minnesota, respectively. From the year 1881, Williams had been engaged in the purchase of pine lands in St. Louis county, Minn., and defendant McKinley had acted as his agent in the purchase and care of the same, under a written agreement, dated September 8, 1882. This agreement was canceled in 1888, but after that time McKinley continued to act for complainant with reference to his lands. In May, 1891, Williams, being in Duluth, was informed by McKinley that large deposits of iron ore existed on some of these lands, and suggested that, in view of their past relations, he be given a chance to obtain

some interest in the same, but nothing definite was settled at that
interview.   In the fore part of July, following, McKinley met Wil-
liams in Chicago, and stated he thought he could interest a very
strong syndicate in the east, including Carnegie, of Carnegie, Phipps
& Co., in these mineral lands, but that, in order to do so successfully,
it would be necessary that he should have a lease of the lands running
to himself, to show that he had control of them and had power to
act as lessor.   Williams then told him that, if he gave him a lease
of these lands, there must be also a private contract between them;
and eventually, on August 1, 1891, complainant executed and de-
livered to McKinley a lease of 13 tracts of about 40 acres each, which
was recorded September 17, 1891, and is as follows:

"This indenture, made this first day of August, A. D. one thousand eight
hundred and ninety-one, by and between J. M. Williams, of Chicago, state of
Illinois, party of the first part, and John McKinley, of Duluth, state of Minne-
sota, party of the second part, witnesseth:

"That the party of the first part, in consideration of the sum of one dollar
($1.00) to him in hand paid by the party of the second part, the receipt
whereof is hereby acknowledged, and in further consideration of the covenants
and conditions herein contained, to be kept and performed by the party of
the second part, does hereby contract, lease, and demise to the party of the
second part for a term of years, from and after the first day of August,
one thousand eight hundred and ninety-one (1891), during and until A. D.
one thousand nine hundred and eleven (1911), the following land, situated in
the county of St. Louis, in the state of Minnesota, viz. [here follows descrip-
tion of land], which premises are leased to the party of the second part for
the purposes of exploring for, mining, taking out, and removing therefrom,
the merchantable shipping iron ore which is or which hereafter may be found
on, in, or under said land, together with the right to construct all buildings,
make all excavations, openings, ditches, drains, railroads, wagon roads, and
other improvements upon said premises which are or may become necessary
or suitable for the mining or removal of iron ore from said premises.

"[Here follows clause giving right and providing for notice necessary to
terminate agreement.]

"The party of the first part hereby agrees that the party of the second part
shall have the right, under this agreement, to contract with others to work
such mine or mines, or any part thereof, or to subcontract the same, and
the use of said land, or any part thereof, for the purpose of mining for
iron ore, with the same rights and privileges as are herein granted to the
said party of the second part.   The party of the second part, in considera-
tion of the premises, hereby covenants and agrees to and with the party of
the first part that the party of the second part will, on or before the tenth
(10th) day of April, July, October, and January, in each year, during the
period hereinbefore stipulated, or during the period this contract continues in
force, pay to the first party, for all the iron ore mined and removed from
said land during the three (3) months preceding the first (1st) day of the
month in which payment is to be made as aforesaid, at the rate of thirty
cents per ton for all iron ore so taken out, mined, and carried away, each ton
to be reckoned at twenty-two hundred and forty (2,240) pounds.

"[This clause provides for weighing and determining amount of ore.]

"It is understood and agreed between said parties that, within thirty (30)
days after this lease is executed, a satisfactory estimate to both parties shall
be made of the pine stumpage (or amount of pine) contained upon said land
described in this lease; and such amount of stumpage thus agreed upon, and
also other timber upon said land, the party of the second part agrees with
party of first part to save him harmless from loss thereof by fire up to July
1st, 1892, at which time said estimated amount of pine is to be paid for in
cash, at the rate of four dollars ($4.00) per thousand feet, by said second
party to said first party, unless said second party, before that time, under the
terms of the lease, abandons all of said mining lands described herein.   All

other timber upon said land is to be used for mining and building purposes by party of second part, for the use of said mines, free and without charge.

"It is further agreed between said parties that from the first of July, 1892, the yearly annual output of iron ore from said land shall be estimated at not less than ten thousand gross tons per year, and that minimum amount of royalty shall be paid as per lease to party of first part, one-half the first of July, and one-half the first of January, of each year, whether the same is mined and shipped from said mine or not; and a failure to pay said royalty at the time specified shall constitute an abandonment of said mines or lease, at the option of the party of the first part. Said second party is to pay all taxes and assessments levied upon said lands embraced in this lease during the continuance of same, unless terminated upon the conditions herein expressed.

"[Here follow clauses providing for payments, and for removal of machinery on condition broken, and for entry to inspect.]

"The covenants, terms, and conditions of this lease shall run with the land, and be in all respects binding and operative upon all sublessees and guarantees under the party of the second part.

"[Clause for re-entry in case of default, and for lien for unpaid balances.]

"To further protect said first party in his property rights under this lease, it is expressly understood and agreed between said parties that this lease shall not be assigned or transferred to any other party or parties without the written consent by said party to such transfer or assignment.

"In witness whereof, the parties hereto have assigned their names, and affixed their seals, on the day and year first above written.

"[Witnessed.]            John M. Williams.  [Seal.]
                              "John McKinley.    [Seal.]"

Contemporaneously therewith an agreement was executed and delivered between the parties, which, at the request of McKinley, was not recorded. This agreement is as follows:

"This agreement, made this first day of August, 1891, between John M. Williams, of Chicago, state of Illinois, party of the first party, and John McKinley, of Duluth, Minnesota, party of the second part, witnesseth:

"That whereas, said Williams has this day executed a certain lease to said McKinley, from the first day of August, 1891, until the first day of August, A. D. 1911, to the following described lands, to wit [description of lands], situated in the county of St. Louis, in the state of Minnesota, for the purpose of mining the merchantable shipping iron ore which is or may be found in, on, or under said land, reference being had for greater certainty to said lease, of even date herewith:

"Now, therefore, said John M. Williams, his heirs, executors, administrators, or assigns, hereby agrees with the said John McKinley, his heirs, executors, administrators, or assigns, to pay to said McKinley, his heirs, executors, administrators, or assigns, one-fifth part of the net revenue arising from the royalties collected by him, said Williams, his heirs, executors, administrators, or assigns, under the terms of said lease, said payments to be made to said McKinley, his heirs, executors, administrators, or assigns, within fifteen days after payment is made to him, said Williams, his heirs, executors, administrators, or assigns.

"In consideration thereof, the said McKinley does hereby agree to save said Williams, his heirs, executors, administrators, or assigns, free and clear from any expense which may be or may have been incurred in the discovery, exploration, or development of said property preparatory to leasing the same, and also agrees to well and faithfully manage said property under said Williams' direction, to the best of his ability, for the mutual interests of both the undersigned parties. Also whatever expense is incurred in conducting the business, in keeping an accurate monthly record of the shipments of the ore from the mines, and rendering a correct quarterly statement or account of the amount due to said Williams from the royalties or otherwise, under said lease, and the remitting of proceeds from parties owing the same, by bank draft on Chicago or New York, payable to the order of said Williams or his heirs and assigns, or other service and attention required for the mu-

tual protection of the interests of both of said parties in and to said mine, shall all be faithfully performed by said McKinley, at his own expense, further than receiving his one-fifth (1-5) interest in the revenues of said mines, as hereinbefore expressed.

"It is mutually agreed, however, between said parties, that in the event that said Williams should wish to dispose of or sell his fee-simple rights or title to said mines or mining lands, to the parties in possession or other parties, he reserves the right to do so, either by selling the same for so much money, cash, or credit, or by merging said lands into a stock company formed alone from his lands, or with other parties and other contiguous lands. If such event should be consummated, said McKinley is to receive for his one-fifth (1-5) interest of the revenues of said mine as hereinbefore expressed, in lieu thereof, in the event of sale, ten per cent. (10 per cent.) of the net proceeds arising from said sale, whether in money or stock, but, if the latter (in stock), such sale shall not be consummated without the consent of said McKinley.

"It is further understood and agreed by said Williams and McKinley, in relation to said lease of lands, executed by said Williams to said McKinley, as herein described, that said McKinley represents and declares that in procuring said lease he is acting for certain other responsible eastern parties with whom he is connected, who form a syndicate for the purpose of mining the iron ore contained in said land and other lands contiguous thereto, and the building of a railroad from Duluth, Minnesota, to said mining and pine lands.

"Now, it is mutually agreed and understood between said McKinley and Williams that the full lease of said land, of even date herewith, executed by said Williams to said McKinley, for the purposes mentioned in said lease, is upon the express condition that said lease is to be assigned over, and its rights and obligations transferred by said McKinley to, said above referred to parties. If said lease is used or transferred or otherwise sublet by said McKinley to other parties without said Williams' consent, said McKinley thereby forfeits all his one-fifth interest in and to the revenues accruing under said lease from said Williams, or his heirs and assigns; and such assignment will, at said Williams' option, work a cancellation of said lease as between said Williams and McKinley.

"The time of this contract shall extend for the period of twenty years, or parallel with the time of said lease, unless for good cause, in equity, or other conditions herein expressed, said McKinley, his heirs, executors, administrators, or assigns, shall, by his or their acts, forfeit his or their claim thereto or under the same.

"Further, if said party of second part should under their rights of lease abandon same, and yield up possession to said first party, in such event this one-fifth (1-5) interest before existing and herein set forth, between said Williams and said McKinley, shall also terminate, and said Williams receive peaceable possession of same as in his first and former estate.

"In witness whereof, the parties hereto have signed their names, and affixed their seals, on the day and year first above written.

"[Witnessed.]                    John M. Williams.  [Seal.]
                                 "John McKinley.    [Seal.]"

The above lease and contract were prepared by complainant, without the aid of a lawyer. Shortly after this, McKinley represented to Williams that the syndicate would not lease the 13 tracts, but that he could lease three 40's thereof to the Merritts, on the same terms, who, he stated, were financially strong, and would be able to build a railroad to the mines, and he believed it was the best thing that could be done. Complainant, therefore, on the 15th of September, 1891, gave his consent in writing that McKinley might lease the three 40's to the Merritts. On September 17, 1891, McKinley, without the knowledge or consent of Williams, but under a prior arrangement with the Merritts, executed to them a lease of the whole 13 tracts, providing for a minimum output of 10,000 tons per annum,

and a royalty thereon of 30 cents a ton, to be paid to himself, or directly to Williams, whether any ore was mined or not. On the same day, McKinley took back to himself from the Merritts a lease of the same land, with the exception of the three 40's he was authorized to lease to them, and with a similar provision therein for royalty, but no minimum output was designated on which royalty should be paid. A clause in the original lease of August 1, 1891, from complainant to defendant, provided that it should not be assigned without the written assent of the party of the first part (Williams), but this clause was omitted in the lease from McKinley to the Merritts, and in the re-lease from them to him. As a consideration for leasing to the Merritts these three tracts and another one called the "Hill 40," McKinley received from them the sum of $30,000. On the same day (September 17, 1891), McKinley, by an instrument in writing, assigned and transferred to James Billings, of Duluth, a one-half interest in the leases, to him from the Merritts, for the sum of $20,000; and shortly thereafter McKinley and Billings sold to a Mr. Humphreys, of Duluth, an undivided four-sevenths interest in the same leases, for the sum of $30,000. The lease from McKinley to the Merritts was filed for record the day it was executed (September 17th), while that from the Merritts to McKinley was not filed until December 23, 1891. None of these leases or transfers were disclosed to Williams by McKinley at the time of the transactions, and he was not made aware of them until some time in March or April, 1892. On September, 18, 1891, the Merritts transferred their lease from McKinley to the Biwabik Mountain Iron Company, providing for a minimum output of 10,000 tons per annum, and the payment to them, or to Williams directly, of 30 cents a ton royalty thereon, whether ore was mined or not; and on April 23, 1892, that company leased the same lands to one Peter Kimberly, with the proviso that not less than 300,000 tons should be mined annually, and a royalty of 50 cents a ton on that amount should be paid, whether ore were mined or not, and that the interest of Williams in the royalty might be paid to him directly. On December 1, 1891, McKinley executed to the Cincinnati Iron Company, a corporation organized by Billings, Humphreys, and himself, a lease of a portion of the lands embraced in the lease to himself from the Merritts, reserving to the lessor 30 cents a ton royalty on a minimum output of 10,000 tons per annum; and that company, on June 23, 1892, sublet this lease to one Barbour, reserving to itself a royalty of 55 cents a ton, with a proviso that not less than 150,000 tons per annum should be mined. As a consideration for executing this lease, McKinley received $300,000 par value of the stock of that company. In June, 1892, McKinley executed a lease of certain other property, embraced in the lease to him from the Merritts, to the Chicago Iron Company, a corporation also organized by Billings, Humphreys, and himself, reserving to the lessor 30 cents a ton royalty, to be paid on a minimum output of 10,000 tons a year. In consideration of the execution of this lease, McKinley received $333,000 par value of the stock of that company. All these leases provided that, whatever the interest of Williams in the royalties

should be, it might be paid to him directly.   None of these transactions of leasing were communicated at the time by McKinley to Williams, and the latter received none of the proceeds thereof, so far as any bonus or stock was concerned.   On the 25th of March, 1892, a question having arisen as to the title of complaint to a certain 40-acre tract described in the lease of August 1, 1891, complainant and his wife, at the request of McKinley, executed to him a lease confirmatory of the first lease, excluding therefrom that certain 40. On the 27th day of April, 1892, Williams executed and delivered to the Biwabik Mountain Iron Company an instrument reciting the lease from him to McKinley, of August 1, 1891, the lease from McKinley to the Merritts, the re-lease from the Merritts to McKinley, of September 17, 1891, the confirmatory lease to McKinley by complainant and wife, of March 25, 1892, and the further fact that the Biwabik Mountain Iron Company desired to lease the lands at present held by it, and that a question had arisen as to whether the Williams lease could be forfeited.   By the terms of this instrument, complainant released and waived the right of forfeiture so long as the company performed all the covenants in the lease, and waived all right to declare a forfeiture against the company by reason of any failure on the part of the Merritts to perform the covenants with regard to the lands held by them.   On December 23, 1892, complainant executed an instrument reciting the lease of August 1, 1891, of certain tracts, and the fact that McKinley desired, under that lease, to sublet those tracts to the Chicago Iron Company, by the terms of which he assented to the subletting, on condition that the company mine at least 10,000 tons per annum, and pay the full royalty expressed in the lease, whether any ore be mined or not.   The defendant, George A. Elder, on the 11th day of March, 1893, entered into an agreement, for a valuable consideration, whereby the defendant McKinley sold, assigned, transferred, and set over to him one-half of whatever profits, money, or property might become due to McKinley under the contract of August, 1891.

Under the foregoing state of facts, what was the relation of the parties to each other, and what are their respective rights? . Counsel for defendant McKinley urges that under a fair construction of the lease and agreement of August 1, 1891, Williams was only entitled to a royalty of 30 cents a ton on a minimum output of 10,000 tons per annum; and, so long as he received that, whatever McKinley obtained in excess, whether in the shape of increased royalties or bonus, rightfully belonged to the latter.   In my opinion, the controlling question in this case is, was McKinley during all this time the agent of complainant, or was the relation between them that of lessee and lessor?   Under the agreement of August 1, 1891, he was clearly the agent of Williams to transfer the lease to a specific party, and in it he "agrees to well and faithfully manage said property under said Williams' direction, to the best of his ability, for the mutual interest of both the undersigned parties." Reading the agreement and lease together, I think the relationship of agency is clearly established.

But counsel, in support of his contention, urges the acquiescence of Williams in the receipt by McKinley of a bonus from the Merritts, and of stock from other parties, at the time when these transactions were brought to his notice, and also the making of the confirmatory leases by complainant in 1892. The acquiescence of Williams was limited to the receipt by McKinley of two or three, or perhaps five, thousand dollars from the Merritts, and no more; and that at a time when it is not pretended that he knew of the leasing of the 13 40's to them, and of the leasing back of the remainder to McKinley. It is true McKinley claims that in the spring of 1892 he informed Williams that he had received $30,000 from the Merritts, and $333,-000 of stock from the Chicago Iron Works, and that he might have informed him of the receipt of $20,000 from Billings, and $30,000 from Humphreys, and that Williams consented to his receiving these amounts; but this is denied by complainant, who states that he asked for an accounting, and it was refused. I think McKinley was mistaken. I do not believe that complainant, the absolute owner of the property, with full knowledge of the whole situation, acquiesced in the receipt by McKinley of these large amounts of money and stock, not one dollar of which was to go to him. As to the confirmatory leases, complainant says he made them under the advice of counsel, as an escape from the lesser of two evils, because, as between third parties, it was probable that these leases could be enforced. The correspondence and evidence show that even at that time complainant was not fully informed as to the true situation, and that he did not understand fully how matters stood until some time in the spring of 1893, when this suit was commenced.

Taking into consideration all the circumstances of the case, and in view of the acts of and the correspondence between the parties, I am satisfied that at all these times Williams had the right to and did look upon McKinley as his agent to look after their mutual interests, and not as his lessee to act independently of him so long as the 30 cent a ton royalty was paid. I am also of opinion that almost from the inception McKinley violated this trust. The leasing of the 13 tracts to the Merritts, the re-lease to himself of the remaining 10, omitting the clause forbidding a sublease without the consent of Williams, and the sale of his interest to Billings, all on the same day, were a plain violation of the terms of the agreement, and such acts alone would work a forfeiture of his interest thereunder.

The agency of McKinley being established, the law is well settled. I hold that McKinley, having made the leases and transfers set out in the bill of complaint without the knowledge of his principal, or without his ratification upon a full understanding of the whole situation, is accountable to complainant for all moneys, notes, and stock received by him as consideration for making any and all of the leases, sales, or transfers in question. I hold, further, that in these transactions, and in all of them, McKinley acted contrary to the best interests of his principal, and for his own benefit and gain, and therefore cannot recover compensation for any services performed by him in connection with the contract of agency.

As the rights of the defendant George A. Elder are dependent

upon those of the defendant McKinley, they must fall with his. A decree will be entered in accordance with the prayer of the bill, and a reference will be had to a master for an accounting, with costs.