Filed 3/27/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION  ONE

| | |
|---|---|
| RAAD AL-SHAIKH,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>STATE DEPARTMENT OF HEALTH<br>CARE SERVICES,<br><br>    Defendant and Respondent. | A147939<br><br>(Alameda County<br>Super. Ct. No. RG14732744) |

**INTRODUCTION**

When Dr. Raad Al-Shaikh, an orthopedic surgeon, moved his Fremont practice a couple of miles from its original location, he applied to the Department of Health Care Services (DHCS), pursuant to Medi-Cal regulations, for approval of his new office as an "established place of business."  He had been an approved Medi-Cal provider at his prior location for six years.  Much to Dr. Al-Shaikh's surprise, the DHCS denied his application on two grounds, only one of which is at issue here.  The DHCS claimed Dr. Al-Shaikh's fee arrangement with the medical billing service he used was unlawful. When Dr. Al-Shaikh filed an administrative appeal, the DHCS agreed the regulatory provisions it had cited in asserting his fee arrangement was unlawful, were inapplicable. It then cited to a different state statutory provision, which incorporates a federal Medicaid regulation.  Although Dr. Al-Shaikh pointed out this federal regulation also was

1

inapplicable, the DHCS was unmoved, and the administrative law judge (ALJ) denied his appeal.[1]  Dr. Al-Shaikh sought writ relief in the superior court.

In the meantime, Dr. Al-Shaikh also relocated his Auburn practice, for which he used the same billing service as he did for his Fremont practice.  His application for Medi-Cal approval for his new Auburn office was granted (by a different regional office of DHCS).

The superior court thereafter heard the merits of Dr. Al-Shaikh's challenge to the denial of his application for his Fremont office.  At the hearing, Dr. Al-Shaikh directed the court's and DHCS's attention to an official publication of the Office of the Inspector General (OIG), the principal law enforcement agency for federally funded health care programs, that expressly states his fee arrangement with the billing service does not violate federal law.  The court took the matter under submission.  The DHCS, in turn, promptly approved Dr. Al-Shaikh's application for his Fremont office and then urged the superior court to deny Dr. Al-Shaikh's writ petition as moot.  The court did not deny the petition, but instead dismissed it as moot and without prejudice to Dr. Al-Shaikh seeking costs and statutory attorney fees.

Dr. Al-Shaikh then moved for fees under Code of Civil Procedure section 1028.5, which allows a small business or a licensee that prevails in an action against a state regulatory agency to recover a maximum of $7,500 in fees if the agency acted (or refused to act) without substantial justification.  The DHCS's position on fees, in a nutshell, was that federally funded health care, implemented through Medi-Cal, is a complicated business and the copy of the excerpt from the OIG publication that Dr. Al-Shaikh presented at the hearing was but a single page of the multitudinous Federal Register.  The DHCS emphasized that once Dr. Al-Shaikh directed its attention to the OIG publication, it promptly approved his application.  Dr. Al-Shaikh, in turn, emphasized it had taken

---

[1]  The ALJ sustained Dr. Al-Shaikh's appeal as to the DHCS's other asserted ground for denying his application.

2

three years to obtain approval of his relocated Fremont office and, during that time, his Fremont practice had been decimated. The trial court denied Dr. Al-Shaikh's fee request.

We reverse and remand with directions to award Dr. Al-Shaikh the full amount of fees recoverable under Code of Civil Procedure section 1028.5. As the state agency responsible for implementing Medicaid and Medi-Cal, the DHCS has an obligation to be knowledgeable about the law it is charged with implementing. Moreover, this is not a case where the applicable regulatory law was unclear or in dispute. On the contrary, the OIG's publication has been on the books for more than a decade, and it has never been questioned by any regulatory body or court. Nor was this publication hidden within the Federal Register. On the contrary, the pertinent OIG publication is one of a series of publications the OIG has prepared to enhance compliance with federal law, and it continues to be cited in reference materials on federally funded health care programs. Furthermore, in its Medicare Claims Processing Manual, the Centers for Medicare and Medicaid has taken the same view on third-party billing as the OIG. Accordingly, it is no surprise that throughout these proceedings the DHCS has been unable to cite a single case or regulatory decision supporting its position that Dr. Al-Shaikh's fee arrangement with the billing service is unlawful.

We conclude the DHCS acted without substantial justification in refusing Dr. Al-Shaikh's application to continue as a Medi-Cal provider in his new Fremont location, and reverse with directions to award statutory attorney fees.

## BACKGROUND

Dr. Al-Shaikh is an orthopaedic surgeon, and at the time of the events in question, had been an approved Medi-Cal provider at his Fremont location for six years. In May 2012, he relocated his practice to an office several miles from his prior location. As required by the DHCS, Dr. Al-Shaikh applied for approval as a Medi-Cal provider at his new Fremont location.

In the course of evaluating Dr. Al-Shaikh's application, the DHCS sent a representative from its Audits and Investigation Division to review compliance with Medi-Cal laws and regulations to determine whether the Fremont practice was an

3

"established place of business."  More than a year and a half later, in December 2013, the DHCS denied Dr. Al-Shaikh's application on the basis of two asserted regulatory violations:  (1) that the third-party billing service he used was paid on a percentage of billings basis (citing Cal. Code Regs., tit. 22, § 51502.1, subd. (e)), and (2) that his office business hours were not permanently posted (citing Cal. Code Regs., tit. 22, § 51000.60, subd. (c)(9)(B)).[2]

Dr. Al-Shaikh filed an administrative appeal.  During the appeal, the DHCS acknowledged the cited authority for denial based on the billing fee arrangement, was inapplicable.  It then cited to other statutory and regulatory provisions, specifically Welfare and Institutions Code section 14040.5, subd. (b)[3] and 42 Code of Federal Regulations section 447.10.[4]  However, the DHCS's fundamental position remained

---

[2] The DCHS states several times in its respondent's brief that it identified a number of regulatory violations in connection with Dr. Al-Shaikh's practice.  It identified a number of deficiencies in Dr. Al-Shaikh's initial application, inviting him to supply additional information, which he did.  In its subsequent denial letter, the DCHS identified only two asserted violations.

[3] Welfare and Institutions Code section 14040.5, provides in relevant part:  "(a) A provider may, by written contract, do either of the following:  (1)  Authorize a billing agent to submit claims, including electronic claims, on behalf of the provider for reimbursement for services, goods, or merchandise provided by the provider to the Medi-Cal program or a Medi-Cal beneficiary. (2)  Assign signature authority for transmission of the claims by the authorized billing agent. (b)  If a contract as described in subdivision (a) is entered into, the contract shall meet the requirements of Section 447.10 of Title 42 of the Code of Federal Regulations or shall have been approved by the federal Health Care Financing Administration for purposes of the Medicare program." (Welf. & Inst. Code, § 14040.5, subds. (a)(1)–(2), (b).)  Thus, Welfare and Institutions Code section 14040.5, subdivision (b) incorporates 42 Code of Federal Regulations section 447.10, making the inquiry under this particular provision a matter of federal regulatory law.

[4] 42 Code of Federal Regulations section 447.10 appears in part 447, subpart A, which "prescribes State plan requirements, FFP [Federal financial participation] limitations and procedures concerning payments *made by State Medicaid agencies* for Medicaid services." (42 C.F.R. § 447.1, italics added.)  Section 447.10, entitled "Prohibition against reassignment of provider claims," specifically, "implements section 1902(a)(32) of the [Social Security] Act which prohibits *State payments* for Medicaid services to anyone other than a provider or beneficiary, except in specified

4

unchanged—that any percentage-based fee arrangement with a billing service violates statutory and regulatory law.  Dr. Al-Shaikh responded that these statutory and regulatory provisions were directed at a different problem, and his fee arrangement with the billing service was not unlawful under either provision.

The DHCS issued its ruling on Dr. Al-Shaikh's appeal in May 2014.  It sustained his appeal as to permanently posted business hours.  It denied his appeal as to the fee arrangement with the billing service, stating, the service "is compensated on a percentage basis . . . [t]herefore, the [a]pplicant is not in compliance with Welfare and Institutions Code, section 14040.5(b), which prohibits compensation for biller services based on a percentage of the amount collected."

Dr. Al-Shaikh then filed the instant writ proceeding, challenging the denial of his application.

In the meantime, Dr. Al-Shaikh also relocated his office in Auburn, in connection with which he also used the same third-party billing service under the same fee arrangement.  He duly applied for Medi-Cal approval for that office, which was granted in September 2014 (by a different regional office of DHCS).

In April 2015, this writ proceeding came before the superior court.  The DHCS continued to insist Dr. Al-Shaikh's fee arrangement with the billing service ran afoul of 42 Code of Federal Regulations section 447.10, and, in turn, Welfare and Institutions Code section 14050.5, subdivision (b).

After the court issued a tentative decision denying writ relief, Dr. Al-Shaikh's attorney directed the court's and the DHCS's attention to an excerpt from the Federal Register in which the OIG had published its "Compliance Program for Individual and Small Group Physician Practices," and, specifically, to that part of the publication expressly stating a physician's percentage fee arrangement with a billing services does

---

circumstances." (*Id.*, § 447.10, subd. (a), italics added.)  We discuss this regulation at length in subsequent paragraphs of this opinion.

5

not violate federal law. (65 Fed. Reg. 59434, 59447 (Oct. 5, 2000).) Stating that it was going to rethink its tentative, the court took the matter under submission.

The DHCS, in turn, immediately approved Dr. Al-Shaikh's application for approval of his Fremont practice location. It then asked that his writ petition be denied as moot. After hearing argument, the court declined to deny the petition, but instead dismissed it as moot, without prejudice to Dr. Al-Shaikh seeking costs and attorney fees.

Dr. Al-Shaikh then sought fees under Code of Civil Procedure section 1028.5, which allows a prevailing small business or a licensee in an action against a state agency to recover a maximum of $7,500 in fees where the agency has acted without substantial justification. The DHCS argued that its concerns about "upcoding" (that is, coding a bill to indicate a more difficult procedure than in fact was performed in order to receive higher compensation from the government— a billing practice that *is* unlawful) had been legitimate. But as soon as Dr. Al-Shaikh's attorney directed its attention to the OIG publication, it approved its application. It also urged the court not to "punish[]" it with a fee award because any fees awarded under Code of Civil Procedure section 1028.5 must be reported to the Legislature and it had "acted fairly" by promptly granting the application after Dr. Al-Shaikh's attorney directed its attention to the applicable law. Dr. Al-Shaikh responded that what the DHCS failed to appreciate was that it had taken him three years to obtain approval and, as a result, his Fremont practice had been destroyed.

The court denied Dr. Al-Shaikh's fee request, stating that "based on the briefing . . . before" it, it had "thought the State was right in terms of what they said about the third-party billing" and that it had changed its view only after Dr. Al-Shaikh's attorney provided the relevant excerpt from the OIG publication.

## DISCUSSION

Code of Civil Procedure section 1028.5, subdivision (a) provides in pertinent part: "In any civil action between a small business or a licensee and a state regulatory agency, involving the regulatory functions of a state agency as applied to a small business or a licensee, if the small business or licensee prevails, and if the court determines that the action of the agency was undertaken without substantial justification, the small business

6

or licensee may, in the discretion of the court, be awarded reasonable litigation expenses in addition to other costs." (Code Civ. Proc., § 1028.5, subd. (a).) " 'Reasonable litigation expenses' " includes reasonable attorney fees and are not to exceed $7,500. (*Id.*, § 1028.5, subd. (b).)

The principal issue before us is whether the DHCS acted "without substantial justification" in denying Dr. Al-Shaikh's application for approval of his relocated Fremont office on the ground the fee arrangement with his third-party billing service violated the law and, specifically, 42 Code of Federal Regulations section 447.10 (and, in turn, Welf. & Inst. Code, § 14040.5, subd. (b)).

As we have recited, the trial court concluded that, based on the briefing the DHCS had submitted, it appeared the agency had a reasonable basis for concluding Dr. Al-Shaikh's fee arrangement with the billing service violated that regulatory law. It was not until Dr. Al-Shaikh's attorney directed the court and the DHCS to the applicable federal law, said the court, that it "agreed" with Dr. Al-Shaikh that the fee arrangement did not violate this regulatory provision. However, in looking at the issue this way, the superior court excused the DHCS from knowing the very law it is charged with implementing and enforcing. In our view, it should not have been left to Dr. Al-Shaikh's attorney to educate the DHCS as to the federal regulatory controls governing the use of medical billing services. While the DHCS attempts to excuse its apparent lack of familiarity with this law by complaining the OIG publication, to which Dr. Al-Shaikh directed its attention, appeared within the pages of the massive Federal Register, this is not *close* to an accurate description of the OIG's efforts to ensure compliance with the law governing federally funded health care programs.

The OIG is the principal federal agency charged with enforcing the rules and regulations governing federally funded health care programs, including Medicaid. (See generally Gosfield, Medicare and Medicaid Fraud and Abuse (2017) § 1:3, at pp. 8–9 [the Inspector General "remains the chief federal spokesperson responsible for policy development, case expertise, and relationships with private third party payors"].) The

7

office is dedicated to weeding out fraud and abuses within this economically massive federal program.  (*Ibid.*)

As part of its effort in this regard, the OIG has issued compliance program guidance for numerous sectors of the health care industry.  (Medicare and Medicaid Fraud and Abuse, *supra*, § 1:1, p. 6.)  So far, the OIG has issued publications pertaining to clinical laboratories (62 Fed. Reg. 9435 (March 3, 1997), 63 Fed. Reg. 45076 (Aug. 24, 1998)); hospitals (63 Fed. Reg. 8987 (Feb. 23, 1998), 70 Fed. Reg. 4858 (Jan. 31, 2005)); home health agencies (63 Fed. Reg. 42410 (Aug. 7, 1998)); third-party medical billing companies (63 Fed. Reg. 70138 (Dec. 18, 1998)); suppliers of durable medical equipment (64 Fed. Reg. 36368 (July 6, 1999)); hospices (64 Fed. Reg. 54031 (Oct. 5, 1999)); Medicare+Choice organizations (64 Fed. Reg. 61893 (Nov. 15, 1999)); nursing facilities (65 Fed. Reg. 14289 (Mar. 16, 2000)), 73 Fed. Reg. 56832 (Sept. 30, 2008)); individual and small group physician practices (65 Fed. Reg. 59434 (Oct. 5, 2000)); ambulance suppliers (68 Fed. Reg. 14245 (Mar. 24, 2003)); and pharmaceutical manufacturers (68 Fed. Reg. 23731 (May 5, 2003)).

These publications represent a major advisement effort by the OIG, and they have been prepared with the same formality that accompanies formal rule making.  (See, e.g., "OIG Compliance Program for Individual and Small Group Physician Practices" (65 Fed. Reg. 59434 (Oct. 5, 2000) ["The creation of compliance program guidances is a major initiative of the OIG in its effort to engage the private health care community in preventing the submission of erroneous claims and in combating fraudulent conduct."].)

Accordingly, in connection with each publication, the OIG, in the Federal Register, has published initial notice and asked for input, published a draft and solicited comments, and, finally, published the final guidance.  For example, in connection with the compliance program guidance for individual and small group physician practices, to which Dr. Al-Shaikh's attorney directed the superior court's and the DHCS's attention, the OIG issued notice of its intent to prepare the guidance and solicited input in September 1999 (64 Fed. Reg. 48846 (Sept. 8, 1999)), published its draft compliance program and solicited comments in June 2000 (65 Fed. Reg. 36818 (June 12, 2000)), and

published its final compliance program in October 2000 (65 Fed. Reg. 59434 (Oct. 5, 2000)).

Each of the OIG's guidance publications discusses the features of an effective compliance program. These features generally include conducting internal audits, implementing compliance and practice standards, appropriate training of personnel, responding to violations (identified during audits), and maintaining open lines of communication among personnel. (See, e.g., "OIG Compliance Program for Individual and Small Group Physician Practices" (65 Fed. Reg. 59434 (Oct. 5, 2000).)

Each guidance publication additionally identifies "specific risk" areas for the particular sector of the health care industry to which the publication pertains. (See, e.g., 65 Fed. Reg. 59438 (Oct. 5, 2000).) Identified "risk areas" are *not* violations of federal law. Rather, they are areas to which the provider of medical services or devices should pay particular attention to *minimize* the *risk* of a violation.

For example, in connection with its "Compliance Program for Individual and Small Group Physician Practices," the OIG "developed a list of four potential risk areas affecting physician practices." (65 Fed. Reg. 59438 (Oct. 5, 2000).) These include, "[c]oding and billing," "reasonable and necessary services," "documentation," and "improper inducements, kickbacks and self-referrals." (65 Fed. Reg., *supra*, pp. 59438–59439.) The OIG discusses each of these risk areas in some detail. For example, with respect to coding and billing, the OIG identifies and defines acts that do or may violate the law, for example, billing for services not rendered, submitting a claim for services that were not necessary, knowing misuse of provider identification numbers, double billing, unbundling, and upcoding. (65 Fed. Reg., *supra*, p. 59439.) In short, it is *these acts by billers* (whether a physician or a billing service), resulting in overpayment by the government, that violate federal law. (See generally, Medicare and Medicaid Fraud and Abuse, *supra*, § 1:7, at pp. 24–28 [discussing the kinds of billing acts that are fraudulent].)

The OIG provides additional, detailed discussion of these potential risk areas for individual and small physician practices in appendix A of the publication. (65 Fed.

9

Reg. 59445 (Oct. 5, 2000).) Part III of appendix A, specifically, discusses "Physician Billing Practices," with the OIG reminding physicians they "remain responsible to the Medicare program for bills sent in the physician's name." (65 Fed. Reg., *supra*, p. 59447.)

The first point the OIG makes in part III of appendix A, pertains to the use of third-party billing services. Given the importance of this point to the instant case, we recite the OIG's discussion it its entirety:

> "One of the most common risk areas involving billing services deals with physician practices contracting with billing services on a percentage basis. *Although percentage based billing arrangements are not illegal per se*, the Office of Inspector General has a longstanding concern that such arrangements may increase the *risk* of intentional upcoding and similar abusive billing practices. [Fn. omitted.] [¶] . . . [¶]
>
> "*A physician may contract with a billing service on a percentage basis.* However, the billing service cannot directly receive the payment of Medicare funds into a bank account that it solely controls. Under 42 U.S.C. 1395u(b)(6), Medicare payments can only be made to either the beneficiary or a party (such as a physician) that furnished the services and accepted assignment of the beneficiary's claim. A billing service that contracts on a percentage basis does not qualify as a party that furnished services to a beneficiary, thus a billing service cannot directly receive payment of Medicare funds. According to the *Medicare Carriers Manual* Section 3060(A), a payment is considered to be made directly to the billing service if the service can convert the payment to its own use and control without the payment first passing through the control of the physician. For example, the billing service should not bill the claims under its own name or tax identification number. The billing service should bill claims under the physician's name and tax identification number. Nor should a billing service receive the payment of Medicare funds directly into a bank account over which the billing service maintains sole control. The Medicare payments should instead be deposited into a bank account over which the provider has signature control.
>
> "Physician practices should review the third-party medical billing guidance for additional information on third-party billing companies and the compliance risk areas associated with billing companies." (65 Fed. Reg. 59447 (Oct. 5, 2000), italics added.)

This straightforward discussion makes two things clear. First, physicians and billing services must pay careful attention to billing practices to ensure that billers do not, in fact, engage in fraudulent practices, such as using a higher than warranted procedure

10

code to obtain greater payment from the government.  Second, physicians and billing services must ensure that payment by the government is, in fact, made *only* to the health care provider.  As the OIG explains, a percentage fee arrangement carries the risk that (a) an unscrupulous biller may engage in conduct that, indeed, violates federal law, or (b) a biller may directly receive part of the government's payment.  Accordingly, the physician and the billing service must be attentive to ensure that such conduct does not occur.  But, again, the fact there may be a "risk" of unlawful conduct, does *not* make a percentage fee arrangement unlawful.

The referenced third-party billing guidance—the "OIG Compliance Program Guidance for Third-Party Medical Billing Companies"—was published two years prior to the individual and small group physician guidance.  (63 Fed. Reg. 70138 (Dec. 18. 1998).)  In this publication, the OIG recognized "[b]illing companies are becoming a vital segment of the national health care industry" and providers are increasingly "relying on billing companies to assist them in processing claims in accordance with applicable statutes and regulations."  (63 Fed. Reg., *supra*, p. 70139.)  It further observed that the range of services by billing companies varies widely, from simply preparing and sending bills, to providing advice on reimbursement issues.  (*Ibid.*)  Its intent in publishing a compliance program guidance specifically for billing companies, said the OIG, is "to establish a culture within a billing company that promotes prevention, detection and resolution of instances of conduct that do not conform to Federal and State law."  (*Ibid.*)

As in its other compliance guidance publications, the OIG outlined the elements of an effective billing company compliance program, including making a risk assessment. (63 Fed. Reg. 70142 (Dec. 18, 1998).)  And as in its other compliance guidance publications, the OIG identified "risk areas" of general concern for billing companies, including, among other things, billing for services not documented, unbundling, upcoding, balance billing, misuse of provider identification numbers, and "company incentives that violate the anti-kickback statute or other similar Federal or State statute or regulation."  (*Ibid.*)  As to the last item, the OIG noted:  "For billing companies that

11

provide marketing services, percentage arrangements may implicate the anti-kickback statute. See 42 U.S.C. 1320a–7b(b) and 59 FR 65372 (12/19/94). *Cf.* OIG Ad. Op. 98-10 (1998). The OIG has a longstanding concern that percentage billing arrangements may increase the *risk* of upcoding and similar abusive billing practices. *See, e.g.*, OIG Ad. Op. 98-1 (1998) and OIG Ad. Op. 98-4 (1998)." (63 Fed. Reg., *supra*, p. 70143, italics added)

Thus, in its "Compliance Program Guidance for Third-Party Medical Billing Companies" the OIG did *not* pronounce percentage fee billing arrangements unlawful. Rather, the OIG recognized that these billing arrangements exist and pointed out that when used, billing companies must be vigilant that their employees do not engage in conduct that *is* unlawful, such as over-billing through upcoding. The OIG also separately discussed the particular risk areas of billing companies that provide coding services, and in that discussion, it recommended that the compensation billing companies pay *their* employees in a manner so as not to "provide any financial incentive to improperly upcode claims." (63 Fed. Reg. 70143–70144 (Dec. 18, 1998).)

The OIG's extensive efforts to combat Medicaid abuse and provide specific guidance with respect to numerous sectors of the heath care industry, including third-party billing companies and individual and small physician practices, have not been hidden away from the purview of governmental health care professionals. On the contrary, the OIG's guidance publications have been, and continue to be, referenced in health care industry reference materials. (E.g., Health Care Financial Transactions Manual § 5:106 (2017) [OIG publications are intended " (1) to offer guidance to the OIG and Department of Justice negotiators in developing settlements for health care providers, and (2) to furnish health care providers with information on how to better protect their operations from fraud."]; Medicare and Medicaid Fraud and Abuse, *supra*, § 1:1, p. 6 ["OIG has issued eleven statements offering Model Compliance Guidance for specific sectors of the health care industry" and "are intended to prevent, as well as create systems to self-disclose, the problems that inevitably arise" in large, complex governmental programs]; *id.*, § 1:5, p. 17; *id.*, § 1:21, p. 69 [OIG compliance program guidelines are a

"major fraud and abuse initiative"]; *id.*, § 1:26, pp. 75–76 [discussing third-party billing publication]; *id.*, § 1:31, pp. 82–83 [discussing individual and small group physician publication].)

Even apart from the OIG guidance, the federal regulation referenced in Welfare and Institutions Code section 14040.5, subd. (b)—42 Code of Federal Regulations 447.10—does not address the kind of billing abuses, such as upcoding, which the DHCS maintained was the vice of Dr. Al-Shaikh's fee arrangement with the billing service. Rather, this federal regulation focuses on a different issue, specifically the statutory requirement that *government payments* are to be made to *the provider* or, in limited circumstances, to the Medicaid beneficiary. (42 U.S.C. 1396a(a)(32); see generally Medicare Claims Processing Manual, Chap. 1, §§ 30.2.1–30.2.5 (MCP Manual).)

Thus, the title of the regulation—"Prohibition against reassignment of provider claims"—and its initial paragraph—"[t]his section implements section 1902(a)(32) of the Act which prohibits State payments for Medicaid services to anyone other than a provider or beneficiary, except in specified circumstances." (42 C.F.R. § 447.10, subd. (a); see generally *Danvers Pathology Associates, Inc. v. Atkins* (1st Cir. 1985) 757 F.2d 427, 430 ["legislative history of the provision makes clear that it was aimed at stopping a practice under which 'some physicians and other persons providing services . . . reassigned their medicare and medicaid receivables to other organizations or groups . . . [which] purchased the receivables for a percentage of their face value, submitted claims and received payments in their name,' " quoting H.R.Rep. No. 393, 95th Cong., 1st Sess. 48, reprinted in 1977 U.S.Code Cong. & Ad. News 3039, 3051.].)

In substance, this regulation specifies: "Payment may be made only—(1) To the provider; or (2) To the beneficiary if he is a noncash beneficiary eligible to receive the payment under § 447.25; or (3) In accordance with paragraphs (e), (f), and (g) of this section." (42 C.F.R. § 447.10. subd. (d).) These three additional paragraphs allow the *government* to pay someone or some entity other than the provider in three, limited circumstances: If a reassignment is to a governmental agency or ordered by a court (*id.*, § 447.10, subd. (e) [entitled "Reassignment"]). If the payment is to a "business agent,

13

such as a billing service or an accounting firm" and the agent's compensation is, among other requirements, related to the cost of billing and unrelated to a percentage of the amount billed or collected (*id.*, § 447.10, subd. (f) [entitled "Business agents"]). If the payment is to an individual practitioner's employer or to the facility or foundation at which he or she provides services and specific requirements are met (*id.*, § 447.10, subd. (g) [entitled "Individual practitioners"]). In addition, paragraph (h) prohibits government payment "to or through" a factor. (*Id.*, § 447.10, subd. (h).)

Thus, as the OIG specifies in its guidance, this regulation, as it states, concerns payments *by a governmental entity*, such as California in connection with the Medi-Cal program, to someone other than the provider. And, specifically, these are the regulatory provisions to which the OIG is referring in part III of appendix A of its "Compliance Program for Individual and Small Group Physician Practices" in stating that a "billing service cannot *directly receive* the payment of Medicare funds." (65 Fed. Reg. 59447 (Oct. 5, 2000), italics added;[5] see MCP Manual, *supra*, Chap. 1, §30.2.4 [discussing payments to "agents" and stating requirements pertaining to compensation are applicable only to a billing agent that claims and receives payment "on behalf of" the provider; "The conditions specified . . . *do not apply* if the agent merely prepares the bills for the provider and does not receive and negotiate the checks payable to the provider/supplier." Italics added.].)

Accordingly, this is not a case where the applicable regulatory law was unsettled or unclear and the DHCS therefore had to make a reasoned call as to the proper application of the relevant law. On the contrary, the principal law enforcement agency for Medicare and Medicaid has clearly and unequivocally stated (in fact, it said so more than a decade before the DCHS considered Dr. Al-Shaikh's application) that a percentage fee arrangement with a third-party billing service does *not* violate federal law. This

---

[5] "[A] payment is considered to be made directly [by the government] to the billing service if the service can convert the payment to its own use and control without the payment first passing through the control of the physician." (65 Fed. Reg. 59447 (Oct. 5, 2000), citing to Medicare Carriers Manual section 3060(A).)

pronouncement by the OIG has never been questioned by any governmental agency or official, or by any court from any jurisdiction. Indeed, the Centers for Medicare & Medicaid Services says the same thing in its MCP Manual. Even the applicable regulatory provisions, on their face, apply only to *governmental* payments *to* individuals or entities other than the provider.

In short, the DCHS refused to allow Dr. Al-Shaikh to continue as a Medi-Cal provider not only without any legal basis for doing so, but in direct contravention of federal law. This was regulatory action "undertaken without substantial justification," under even the most generous meaning of this language.[6] (See *Evilsizor v. Sweeney* (2014) 230 Cal.App.4th 1304, 1312 ["substantial justification" means a justification that " 'is clearly reasonable because it is well grounded in both law and fact,' " quoting *Doe v. United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1434].)

The DCHS asserts that if we conclude it acted without substantial justification, we are also indicting the superior court, given that its tentative ruling was in favor of the state agency. Not so. The court stated that its tentative ruling had been based on the briefing submitted before the hearing on the merits, which included the DCHS's brief. It is not the fault of the court that the DCHS's assertions in its brief about the controlling law were flatly in error and squarely contrary to seminal publications by both the principal agency charged with enforcing the law applicable to federally funded health care programs and the Centers for Medicare & Medicaid Services.

We further conclude that, given the settled state of the applicable law and the record in this case, the discretion to award fees under Code of Civil Procedure section 1028.5 can only be exercised in one way—by awarding Dr. Al-Shaikh the full $7,500 in attorney fees authorized by statute. That the DCHS may have to report a fee award to the Legislature and pay the award out of its own resources provides no grounds to withhold

---

[6] That the DHCS promptly approved Dr. Al-Shaikh's application on being directed to the OIG's publication does not mean, contrary to the DHCS's view, that it acted reasonably in refusing, for three years, to approve the application on the ground Dr. Al-Shaikh's fee arrangement with the billing service violated federal law.

15

fees.  These consequences will occur in *every* case under Code of Civil Procedure section 1028.5, and if they sufficed to discretionarily deny fees, the statute would effectively be rendered a nullity.[7]

## DISPOSITION

The order denying attorney fees under Code of Civil Procedure section 1028.5 is reversed, and the matter remanded with directions to grant Dr. Al-Shaikh's request under section 1028.5 for $7,500 in statutory attorney fees.

---

[7] Because Dr. Al-Shaikh represented himself on appeal, we need not, and do not, consider whether an additional statutory award may be available for appellate fees incurred in successfully challenging a trial court order denying statutory fees.

_____

Banke, J.


We concur:


_____

Margulies, Acting P.J.


_____

Dondero, J.


A147939, *Al-Shaikh v. California Department of Health Care Services*

17

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Evelio M. Grillo

Counsel:

Raad Al-Shaikh, in pro. per., for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Dane C. Barca, Beverley R. Meyers and Cheryl L. Feiner, Deputy Attorneys General for Defendant and Respondent.